**In re Bryan Allan GRAYDON d/b/a The Players Club, Debtor.**

**MGIC FINANCIAL CORPORATION, Plaintiff,**

v.

**Bryan A. GRAYDON d/b/a The Players Club, Defendant.**

Bankruptcy No. 80–00959–BKC–JAG.

Adv. No. 80–0257–BKC–JAG–A.

United States Bankruptcy Court, S. D. Florida.

Jan. 16, 1981.

Paul R. Lipton, P. A., North Miami Beach, Fla., for plaintiff.

Richard W. Smith, Johnson & Smith, P. A., Fort Lauderdale, Fla., for debtor-defendant.

### FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This matter was tried on the complaint of MGIC Financial Corporation (MGIC), plaintiff, seeking a modification of the automatic stay (11 U.S.C. § 362) to permit it to proceed with state court foreclosure of certain real property of the debtor-defendant Bryan A. Graydon d/b/a The Players Club (Graydon), and on Graydon's counterclaim seeking relief for damages arising out of the same transaction which gave rise to plaintiff's mortgage. The misfeasances or misfortunes which have plagued this property throughout its reported history seem to have followed the case to this court. After four hearings, one of which was terminated by a fire alarm, the court has unraveled the facts of the case as follows.

Prior to Graydon's appearance on the scene, MGIC was the first mortgagee on the

subject property, which was operated as a sports club-hotel, restaurant and lounge. The business was known as the Players Club and at that time the mortgagors were Bigelow and others. Due to events not revealed in this case, the business was placed in a state court receivership, with Bigelow acting as receiver, and MGIC commenced a foreclosure on its mortgage in 1976. In the spring and summer of 1977, Graydon became involved with the Players Club under an option agreement to purchase MGIC's mortgage. Graydon and MGIC eventually entered into an agreement, dated October 5, 1977 (Defendant's Exhibit A) in which Graydon received an assignment of the first mortgage and was required to complete the foreclosure within one year. At the same time, Graydon stepped into active management of the Players Club and was to assist the receiver and then obtain his discharge. The purchase price to Graydon was $90,000 in cash plus a $1,130,000 mortgage, the term of which commenced on October 1, 1978, with interest only (at eight and one-half percent) payable for the first three years and a balloon payment at the end of seven years. Under the agreement MGIC was to pay taxes and insurance to October 1, 1977 as well as "all outstanding receiver charges and operating deficits of the receiver in operating the club" to that date.

Graydon did advance his own funds to the receivership operation, commencing about June, 1977. There continued to be difficulties with the receivership, and although MGIC separately contracted with Graydon to prepare the receiver's accounting, this was not finally completed, and the receiver officially removed until October, 1979. The foreclosure was completed in the summer of 1978, and the parties closed at about that time, although the amounts owed by MGIC under the October 5, 1977 agreement had not yet been resolved pending completion of the accounting. After the term of the mortgage commenced in October, 1978, Graydon made twelve monthly payments to MGIC, although several checks were dishonored and almost all payments were late. MGIC made some of its payments for the receivership period, but then withheld further payment, apparently because of dissatisfaction with Graydon's conduct. Graydon felt, as asserted at trial, that the amounts due him from MGIC were offsets of his obligation under the mortgage, and that since they exceeded the amounts he owed, he was not in default. MGIC filed a state court foreclosure action but had not obtained service on Graydon at the time he filed a voluntary petition in bankruptcy under chapter 11 on July 29, 1980.

Plaintiff's two experts gave appraisal values for the property at $1,750,000 and $1,700,000, respectively (Plaintiff's Exhibit Numbers 13 and 14). Defendant's expert had appraised the property in May, 1977 at $3,000,000 (Defendant's Exhibit C). He stated that time considerations had prevented his updating any aspect of that appraisal except to revise the cost approach estimate upwards to $2,628,000. The broker retained by the debtor to seek a purchaser for the property appraised it for the receiver in 1974 at $2,252,000 and believed it should be saleable today at $2,500,000.

Plaintiff seeks to have the stay lifted, modified or conditioned for lack of adequate protection under 11 U.S.C. § 362(d)(1). At the conclusion of trial it conceded that the debtor does have equity in the property, and therefore § 362(d)(2) would not be applicable. Although such determination is not essential to the result under § 362(d)(1), it should be noted that there was insufficient evidence before the court to make a determination of the actual amount of the debtor's equity. Plaintiff introduced documentary evidence of tax and judgment liens on the subject property (Plaintiff's Exhibit No. 6–11). It offered no other specific evidence regarding junior secured interests. In discussing hoped-for sales, Graydon, while testifying for his own case, stated that, in addition to the cost of MGIC's mortgage, he would need to obtain $181,000 to pay off other creditors. While this is an admission by a party, it is not probative on the issue of equity because it was not shown whether the $181,000 contemplated only secured creditors and the

court has no way of comparing that figure to other debts specifically dealt with, such as taxes. Debtor's schedules in the bankruptcy proceeding show no junior mortgagees and do not in any way correspond to or explain the figure of $181,000. In fact, they show substantially less total debt (apart from that owed to MGIC).

Looking first at the amounts owed by Graydon to MGIC, even giving defendant credit for all of the amounts owed to him by MGIC, defendant was nevertheless in default on his payments on the mortgage note at the time the bankruptcy petition was filed and therefore plaintiff had the right to accelerate the principal debt. Interest payments in the amount of $8,004.17 per month are due from October 1, 1979 (Plaintiff's Exhibit No. 1). The total due at the time of the bankruptcy filing was $80,041.70. Since the filing, interest accrued to February 1, 1981 totals $48,025.02. The accelerated principal due to MGIC is $1,130,000. There was some testimony that Graydon has failed to pay for insurance as required by the mortgage, and that plaintiff obtained the insurance. No documentary evidence was submitted by plaintiff and the court has insufficient evidence to consider any amount for insurance in the total debt owed to MGIC. Finally, during trial MGIC paid the 1977 real estate taxes on the property. Since it had not previously paid to Graydon its share of those taxes as required by the October 5, 1977 agreement, it does not receive reimbursement for the full amount, but only for Graydon's share, which amounts to $6,107.91 (Defendant's Exhibit G). These amounts due to MGIC by Graydon total $1,264,174.63.

Graydon has not paid the 1978, 1979 or 1980 real estate taxes on the property. Although these are not owed to MGIC, the tax liens take precedence over MGIC's mortgage and reduce its security. Plaintiff did not submit documentary evidence but its controller, Richard Knudsen, testified that taxes for 1978 were $28,000 and for 1979 were $23,000. These total $51,000. Taxes in a similar amount are presumably accruing for 1981.

Likewise, there are unpaid taxes for which MGIC is liable pursuant to the October 5, 1977 agreement. These consist of Florida unemployment taxes, Federal unemployment taxes and an I.R.S. tax lien, all dating from the receivership. The Florida unemployment taxes to October 1, 1977, plus interest accrued to December 31, 1980, amount to $16,386.22 (Defendant's Exhibit V). The Federal unemployment tax is $9,068.60 (Defendant's Exhibit L) and the I.R.S. tax lien for the tax period ending June 30, 1976 (Defendant's Exhibit K) is for $3,970.66. These total $29,425.48. All other taxes originally asserted by defendant to be plaintiff's responsibility were either paid by plaintiff during trial or were conceded by defendant to have already been paid by plaintiff or from funds supplied by it.

We now proceed to the amounts owed by MGIC directly to Graydon, under the October 5, 1977 agreement. During the summer of 1977, Graydon and his partner, Donald Proudfoot, advanced operating funds to the Players Club. Graydon subsequently purchased Proudfoot's interest and now asserts the total amount as due to him. Defendant's Exhibits N, O and P, consisted of numerous checks, deposit slips, deposit receipts, notices of wire transfers, and other documentation, frequently corroborative, of various amounts advanced by Graydon, Proudfoot, and one Kenneth Morgan, who was not referred to in testimony. Exhibit W shows additional funds provided by Proudfoot. The total of all of these, eliminating duplications, amounts to $29,050. However, the accounting prepared under Graydon's auspices for the state court receivership shows the "net" funds provided by Graydon and Proudfoot as being $19,767 (Plaintiff's Exhibit No. 16). In view of the considerable confusion over accountings and the evidence produced and not produced for discovery and at trial, the court finds the amount shown on the accounting to be the more credible figure for the amount owed to Graydon by MGIC for these advances.

Graydon paid for operating licenses for the 1976-1977 period to a total of $1,455, as testified to by Graydon and shown on De-

fendant's Composite Exhibit R. There were also bills for advertising from WAXY radio in the amount of $957 (Defendant's Exhibit M) and from Gold Coast Pictorial Magazine (Defendant's Composite Exhibit Q) in the amount of $1,445 which Graydon testified were eventually paid through use of a club account by principals of these creditors. All of these amounts come within MGIC's covenant to pay operating deficits of the receivership and are owed to Graydon by MGIC.

Defendant also made claims for $7,000 as reimbursement of funds which the receiver wrongfully paid himself, and for $2,000 worth of services provided to personal creditors of the receiver which he permitted them to receive in repayment of their loans. All of this occurred during the receivership and before the closing. The court concludes that these are not owed by MGIC. The contract did not warrant to protect Graydon against all wrongdoing of the receiver, but equally important, it appears that these amounts are already encompassed in the sum of $19,767 advanced by Graydon, referred to above. Although defendant presented no comprehensive accounting to this court, from Graydon's testimony and the picture which emerged of his operation and accounting practices, it seems apparent that these two deficits must have been funded in some manner at that time, for the club to continue operating, and it appears that they were funded as part of the $19,767 advanced to the receivership. Considered in another light, had Bigelow not removed the $7,000 and not permitted $2,000 worth of supplies or services to be taken, there would have been a smaller overall deficit for Graydon to fund at that time with his personal funds.

The court also concludes that defendant is owed $10,000 (Defendant's Exhibit S) by plaintiff for accounting fees, pursuant to their agreement and the order of judge Tedder in the receivership proceedings (Defendant's Exhibit D). Plaintiff offered no evidence reducing defendant's assessment of the fees in that amount, and the evidence elicited by plaintiff in the testimony of Players Club staff members who worked on the accounting suggests that the actual expense to Graydon was probably greater than $10,000.

Finally, defendant asserted the right to the $11,147.14 which is still held in a trust account created pursuant to paragraph 12 of the October 5, 1977 agreement. That account was for the payment of repairs and capital improvements and Graydon was to be reimbursed upon the presentation to MGIC of appropriate vouchers. The only evidence before the court as to the reason for nonpayment was that MGIC refused to continue payment because of dissatisfaction with Graydon. Graydon testified that he had submitted over $5,000 worth of vouchers which had been refused by MGIC and that he then discontinued submitting the vouchers although he had over $7,000 worth of additional costs which came within the terms of that paragraph. No documentary evidence was submitted of those costs. This court concludes that MGIC is liable for any costs incurred for repairs or capital improvements, to the maximum of $11,-147.14, but cannot assess an amount at this time.

By the conclusion of the trial, defendant had abandoned all other items included in his counterclaim.

Plaintiff argued that it was prepared to pay any receivership taxes it owes if presented with a bill by the proper taxing authorities. We therefore find that the amounts of those taxes with interest to the date of payment are to be paid by plaintiff and that defendant is to provide plaintiff with current tax bills.

■ All of the debts owed by MGIC to Graydon except for the accounting fee were closely connected to the assignment of mortgage transaction and the mutual obligations of both parties. The court concludes that these debts, totaling $22,179, should properly offset plaintiff's claim.

The agreement regarding payment of accounting fees, as confirmed by the Circuit Court order, was a contract for personal services by Graydon in the administration of the receivership, and was not necessarily

connected with the transaction which gave rise to the security interest. Therefore, MGIC will be required to pay Graydon $10,000.

To evaluate the protection presently existing for plaintiff's secured claim, the court will use as the value of the property its lowest appraised value, $1,700,000. Subtracting defendant's current debt to plaintiff of $1,264,174.63 plus real estate taxes now owed of $51,000, and adding the $22,179 owed by plaintiff to defendant, there is left a cushion of $407,004.37. Even with interest and taxes accruing at the rate of approximately $10,000 per month, there is no immediate threat to plaintiff's security. (The court recognizes that the figures, and the equities, will change rapidly at the point at which principal payments become due.) However, in considering the total concept of adequate protection, the court recognizes the unfairness to a creditor of permitting the debtor to operate these facilities during prime tourist season, without any accounting for income and with no end to the hiatus in the creditor's income stream in sight. Therefore, the continuing of the automatic stay against plaintiff's pursuit of its foreclosure action will be conditioned upon the defendant's maintaining insurance as required by the mortgage and his payment to MGIC of monthly interest and real estate tax accrual for 1981, commencing with the February 1, 1981 payment, subject to a reduction in the monthly payments on the debtor's showing that revenues from the operation of the Players' Club are insufficient to produce the required payments, and after notice and an evidentiary hearing. The court will retain jurisdiction to consider such an application by defendant if it be merited. This determination is without prejudice to plaintiff to seek further relief under changed circumstances.

Pursuant to B.R. 921(a), a separate Final Judgment incorporating these Findings and Conclusions is being entered this date.